IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Thomas R. West<br><br>Plaintiff<br><br>v.<br><br>Estebita Motors, et al<br><br>Defendants | **Civil No. 10-1256(PG)**<br><br>**Jury Trial Demanded** |

**DEFAULT JUDGMENT**

This court entered a default judgment against Estebita Motors, Inc. ("Estebita" or "Defendant"), on September 18, 2012. On March 20, 2013 a default evidentiary hearing was held where Estebita Motors, Inc. failed to appear and where expert medical testimony in addition to plaintiff's testimony was heard. The court therefore makes the following findings of fact and conclusions of law whereby it finds that Estebita Motors, Inc. is responsible to plaintiff for the damages resulting from the accident of April 6, 2009 in the amount of **$4,000,000.00**.

**I. FINDINGS OF FACT**

We take the following facts from the testimony by witnesses at the default damages hearing. We also incorporate by reference the findings of fact in docket no. 60, the Opinion and Order against Estebita Motors Inc. of September 19, 2012, and the stipulated documentary evidence in Docket No. 72, page 20, consisting of medical records in the English language for Mr. West and the orthopedic expert report by Dr. Carlos Grovas-

Badrenas of June 13, 2011. See, e.g., *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 539 n. 6 (CA1 2011) (reiterating that the local rules of this District and federal law mandate federal litigation to be conducted in English) (citing D.P.R. Civ. R. 5(g); 48 U.S.C. § 864; *Estades-Negroni v. Assocs. Corp. of N. Am.*, 359 F.3d 1, 2 (CA1 2004) (per curiam)).

1. On April 6, 2009, plaintiff Tomas R. West ("Plaintiff" or "Mr. West") was driving a 1992 Nissan Sentra XE purchased at Estebita Motors Inc. on PR Route 1 when he suddenly and violently lost control of the car, hitting a parked van, starting a chain collision. The day was clear and dry.
2. The air bag in the car did not deploy.
3. Mr. West was trapped in the car and could not move, his right hand was sliced open bleeding heavily and had an unbearable pain in his left hip. He was scared and panicked.
4. The fire department had to cut open the driver's side door to get him out of the car. Paramedics took him to the Puerto Rico Medical Center, Trauma Unit, for treatment.
5. The pain endured by Mr. West while waiting for two (2) hours for treatment was excruciating, with the right index finger knuckle bone visible through his injury and his left leg unable to straighten, propped up in the air.
6. Once in the trauma unit he was told that his left hip was dislocated and fractured, requiring it to be "popped back", or go through a closed reduction into its socket after pain

   medication was administered. A metal rod was drilled through his left knee to commence traction.

7. His right hand was surgically repaired at that time.

8. Mr. West was kept sedated on and off for the next week, when on 13 April 2009 he was subjected to surgery because the left hip socket wall, or acetabulum, was fractured. An open reduction was performed to place a metal plate and four (4) screws to repair the hip socket fracture. At that time multiple fragments of bone had to be removed.

9. Also, upon surgery it was found that the head of the femur had suffered injury to the articular cartilage, where the hip joint articulates.

10. After remaining hospitalized for three (3) weeks, he was discharged and ordered to continue physical therapy treatment for the next three (3) months, at a rate of three (3) therapy sessions a week.

11. The fracture dislocation of the left hip suffered by Mr. West when he was just 21 years of age was the direct result of his moving vehicle accident of 6 April 2009.

12. During this time he was restricted to remaining at his apartment in Caguas and going out exclusively for his physical therapy sessions.

13. After ending the physical therapy sessions and graduating from college in June 2009, Mr. West returned to New York to live with his father.

14. Once in New York, Mr. West had no income so he obtained

Medicaid health insurance from the state of New York through United health Care.

16. Once he obtained insurance coverage, he sought medical care at the Nassau University Medical Center, where he had Dr. Avshalumov as his orthopedic surgeon and Dr. Cheema as his psychiatrist.

16. He sought psychiatric care because he was suffering from repeated nightmares about the accident since his return to New York in June 2009.

17. Dr. Avshalumov found that Mr. West had developed three (3) main conditions. One, heterotopic bone or a calcification of the soft tissues, muscles, tendons and ligaments around the hip joint that were injured in the process of the hip dislocation. Two, this calcification or ankylosing caused painful loss of hip motion at the joint.

18. The pain experienced by Mr. West at this time was described as unmanageable.

19. Finally, Dr. Avshalumov found that the head of the femur had lost its circulation due to the traumatic effect of the dislocation through the acetabulum, causing avascular necrosis or death of the bone, causing it to collapse.

20. Dr. Avshalumov prescribed a regime of physical therapy at Complete Care Physical Therapy and on October 17, 2011, Mr. West underwent a procedure where his left hip socket and the head of the femur were removed and prosthesis was inserted.

21. The procedure included the removal of heterotopic bone

formations around the hip area and a left hip orthoplasty.

22. The total hip orthoplasty, or total hip replacement performed included the removal of the neck and head of the femur, insertion of metal prosthesis in the shaft of the bone and reaming of the hip socket to place a metal socket with a plastic liner.

23. The main reason why this procedure was performed on Mr. West was to manage the continuous, unrelenting pain he was suffering due to the condition of the bone. He was experiencing pain in the scale of 8-9 out of ten in most of his daily activities as evidenced by the x-rays showing excessive heterotopic bone formation and the femur's avascular necrosis that caused it to have repetitive and continuous microfractures.

24. Immediately after the total hip replacement was the best day of maximal medical improvement for Mr. West, when he would feel the least pain for his condition. At the time of his testimony, Mr. West was feeling pain of an 8 in a scale of 1-10, which he testified is normal.

25. As far as his musculoskeletal system is concerned, Mr. West's day of maximal medical improvement was immediately after the end of the 30 therapy sessions that followed the hip replacement in 2011.

26. Once the hip replacement was performed, the artificial femur head inserted into the bone started sinking, so Mr. West must observe a sedentary or limited physical lifestyle. The

type of prosthesis inserted does not allow Mr. West to perform repetitive and continuous motions like walking, running, stair climbing or descending, kneeling, stooping or bending. His sexual activities must be cautious.

27. As a result of this operation, Mr. West must perform very limited social and sport-type activities for the rest of his life for fear of increasing the wear and tear of the prosthesis.

28. Mr. West has leg length discrepancy, with the operated leg slightly longer, by half an inch, than the other.

29. He also has atrophy of the buttocks or gluteal musculature, atrophy of the left thigh of one inch, and limited left hip motion.

30. As an additional medical consequence of the 6 April 2009 accident Mr. West suffers from Post Traumatic Stress Disorder and Anxiety Disorder, a common occurrence in patients who experience trauma.

31. All of Mr. West's daily functions and major life activities, for the rest of his life, have been altered. The danger of dislocating the prosthesis by hyper flexing the hip causes him to perform his daily activities in a way completely different from other persons his age.

32. Between the time of the accident in 2009 and the hip replacement surgery in 2011 Mr. West could not find work, nor had time for friends or a social life because of the medical appointments and treatments. His father was his only financial

support.

33. Having received the hip replacement at such a young age, and considering that he can live 55 more years, it is a medical certainty that he will undergo at least three more revisions or reimplantations or renewals of the hip orthoplasty. If Mr. West is cautious and lives a sedentary life, the normal wear and tear of the replacement could last approximately 15 years.

34. Because the bone in the replacement area is reduced, each subsequent revision will be longer and more difficult. He could be exposed to more serious complications, including osteopenia, or the sinking of the socket liner into the pelvis area and deep venous thrombosis.

35. Mr. West will be an orthopedic patient for the rest of his life.

36. At the time of the hearing, Mr. West had an impairment value of 12% according to the Guides to the Evaluation of Permanent Impairment of the American Medical Association, 6th Edition.

37. Mr. West's disability, however, or how his impairment affects his activities is much more serious. He is disabled in all of the daily functions or activities in life. Before the replacement surgery Mr. West had a severe pain problem and at the time of the hearing he had a moderate pain problem.

38. Mr. West's medical condition after the accident, between 2009 and 2011, prevented him from obtaining gainful employment

despite the completion of his college degree.

39. After recovery from the hip replacement surgery and subsequent physical therapy, he was only able to obtain part time, minimum wage work as a teacher.

40. Mr. West's medical condition after the accident and until the time of the hearing prevented him from having any social life, causing him to feel isolated and without friends.

41. Also, the medications that he must continue to take to treat his psychiatric condition limit his capacity to focus on important daily activities, and cause him concentration problems.

42. These medical limitations cause him to be unable to attain full time work and thus keep him away from financial independence.

43. His father helps him pay for his student loans, which at the time of the hearing, in March 2013, totaled $18,360.52.

44. His permanent disability and impairment cause Mr. West to be depressed.

**II. CONCLUSIONS OF LAW**

The evidence considered by the court establishes that Estebita Motors, Inc. is responsible for the uncontested serious bodily, emotional and psychological damages suffered at the present time and, with medical certainty, to be suffered in the future as a consequence of the car accident on April 6, 2009. No measure of caution or ability in driving the dangerously

malfunctioning vehicle could be exercised by Mr. West to prevent the fateful accident of April 6, 2009.

The Puerto Rico Civil Code, in pertinent part, provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141 ("Article 1802" or "Section 5141"). Article 1802 provides for a cause of action stemming from an individual's negligent acts. *Isla Nena Air Servs., Inc.v. Cessna Aircraft Co.,* 449 F.3d 85. 88 (CA1 2006). A claim under Article 1802 requires that the plaintiff prove three *prima facie* elements: "(1) a negligent act or omission, (2) damages, and (3) a causal relationship between them." *Acevedo Reinosov. Iberia Lineas Aereas de Espana S.A.,* 449 F.3d 7, 15 (CA1 2006) (internal citations omitted). A showing on each of these three elements is required in order to be entitled to an award under Article 1802. When the first element is based on an omission, the defendant must have had a duty to act. *Rodriguez-Quinones* v. *Jimenez & Ruiz, S.E ..* 402 F.3d 251. 254-55 (CA1 2005). Furthermore, liability will only arise under a failure to act if the damages complained of were reasonably foreseeable to the defendant. *Irvine, IRG v. Murad Skin Research Labs, Inc., 194 F. 3d 313,* .321-22 (CA1 1999). Finally, "[i]n order for liability to attach, the negligent act must be the 'adequate cause' of the harm." *Tokyo Marine and Fire Ins*.Co .. *Ltd.* V. *Perez & Cia ..* De Puerto *Rico, Inc..* 142 F.3d 1, 7 n. 5 (1st Cir.1998) (citations

omitted). Adequate cause is a concept similar to proximate cause. *Id.* (citing Puerto Rico decisions explaining "adequate cause").

The default of Estebita Motors, Inc. was entered on September 19, 2012. Therefore, the issue of liability has already been established. Mr. West suffered the serious and permanent physical and emotional injuries that will afflict him for the rest of his life because of the breach of Estebita's duty of care in the sale of the vehicle. Therefore, the Defendant is considered to have proximately caused the car accident that ultimately injured Plaintiff.

The evidence presented at trial clearly establishes that the damages caused to Mr. West as a direct consequence of the accident of April 6, 2009 were catastrophic, and resulted in the permanent alteration of all his major life activities. The evidence also clearly established that the medical procedures performed to Mr. West's left hip are not a one-time incident but the first of at least three more total hip replacements that will be required throughout his lifetime to remedy the injuries sustained during the accident. The surgical interventions performed as of this date, and at least three more such hip replacements in the future will disrupt Mr. West's major life activities, cause him great pain and suffering, and in the medical sense result in increasingly more complicated and dangerous medical interventions.

Taking as true the unchallenged trial testimony, the permanent disability caused by the injuries sustained during the

10

accident will require Mr. West to be a lifelong orthopedic patient and to observe a very sedentary lifestyle or else risk major damage to his left hip prosthesis. During the years between the accident and the total left hip replacement, Mr. West suffered from what he described as "unbearable pain", and was unable to find gainful employment. He led a limited social life and was diagnosed with post traumatic stress disorder and anxiety disorder, both related to the trauma of the April 2009 accident. Between 2009 and 2011, his life was severely limited to completing physical rehabilitation therapy, medical appointments and managing the pain he endured. The severe physical limitations placed on him by his medical conditions and medications were the primary cause for his inability to find work. After his first total hip replacement surgery, his medical condition is will deteriorate due to wear and tear of the prosthesis, inevitably leading to the medical certainty of future hip replacements. It is thus the testimony of Plaintiff's medical expert that during the course of his life, at least three more left hip replacement surgeries will have to be performed. He will endure the same type of pain and suffering that he had to endure during his first surgery in October of 2011. Considering the uncontested medical testimony, Mr. West will endure major pain and suffering and will experience longer and possibly more difficult complications and extended recoveries. This means that his life activities in the sexual, social, work and recreation areas will inevitably be disrupted and he will continue experiencing the same emotional,

11

psychiatric and medical symptoms he has experienced in the past and throughout the present.

The uncontested testimony also reveals another serious consequence of the accident was the disruption of Mr. West's productive economic life. At the time of the hearing, almost four years after the date of the accident, he has been unable to support himself through gainful employment.  His inability to work qualified him for New York state health insurance, without which his medical care would have been impossible to obtain. The generosity of his father has helped him pay his student loans incurred attending the Interamerican University in San Juan. His father has also been the main source of support for Mr. West since the day of the accident and continues to provide him with a home and financial assistance for his everyday needs. The work Mr. West has been able to perform has been limited by the restrictions on his mobility and physical activities caused by his prosthesis and the psychiatric medications he must continue to take as part of his post-accident medical treatment. Prior to the time of the hearing, the only job he could secure was part-time earning the minimum wage. It is undisputed that the economic consequences due to the alteration of his capacity to work are also a direct consequence of his condition after the April 2009 accident.

## III. DAMAGES

In both the Complaint and his Answer to Counterclaims, dockets 1 and 11, Plaintiff requested judgment in the following amounts:

- At least $1,000,000.00 for his physical and emotional pain, suffering and disability caused by the accident due to Estebita's fault or negligence;

- At least $1,000,000.00 for lost past and future income due to fault or negligence;

- At least $50,000.00 for medical expenses and liabilities incurred in as a result of the accident;

- At least $200,000.00 in future medical expenses, AND

- All reasonable attorney fees and costs incurred in the litigation of the case.

As established by the United States Court of Appeals for the First Circuit, the "paramount focus in reviewing the damage award must be the evidence presented at trial." *Whitfield v. Meléndez-Rivera,* 431 F.3d 1, 16 (1st Cir. 2005) (internal quotations omitted) "The district court's task [is] to determine the *maximum dollar amount* that is supported by the evidence (citations omitted)." *Soto-Lebron v. Federal Express Corp.*, 538 F. 3d 45, 70 (CA1 2008).

Given that Plaintiff has presented uncontested evidence of the three elements required in order to be entitled to an award under Article 1802 against Estebita Motors, Inc., the court concludes that it must pay for those damages. Since the

13

determination of amount in controversy is to be decided under federal standards, we evaluate the evidence in light of Plaintiff's allegations, and the quantum and nature of the evidence presented at the evidentiary hearing.

An examination of the testimonies of the witnesses at the hearing reveals a deep scar in the life of Mr. West. The uncontested testimony about the physical and emotional condition of Plaintiff resulting from the accident of April 6, 2009 establishes not only that it had an immediate impact, but also a permanent and potentially serious medical scenario lasting his whole life. This type of permanent lifelong injuries are of the kind that justify an award including both past end expected future losses that will occur with an uncontested degree of medical certainty as testified by the expert.

The uncontested evidence at the hearing also showed that there is an ongoing incapacity to obtain full time employment due to the permanent damages of Mr. West, and that there are permanent physical and emotional disabilities that will forever affect the type of work he can perform. This is also a component of the damages according to Puerto Rico law. See *Rosario Ortega v. Star-Kist Foods, Inc.*, 370 F.3d 124 (1st Cir. 2004). Since there was no evidence presented during the hearing to put a monetary value to the damages as per the testimony presented, we must then look at "sufficiently factually similar" cases in order to assign a dollar value to these damages, considering how "dramatic or disruptive" those damages were. Id, at p. 131.

The case of *Whitflied v. Melendez Rivera*, 431 F. 3d 1, 16-17 (1st Cir. 2005), provides a road map for calculating a plaintiff's request for damages claimed in the complaint vis-à-vis the amount that the evidence submitted at trial has reasonably shown. At trial, the evidence showed that Mr. West was a young man of 22 at the time of the accident and that his life expectancy was approximately 55 years of age. He will require at a minimum three more hip replacement surgeries during his life. He endures pain on a daily basis and the same will accompany him for the rest of his life. Since the time of the filing of this complaint in 2010, the emotional, clinical and economic outlook of Mr. West has worsened, as evinced by the uncontested testimony of both expert and Plaintiff. His employment prospects are not encouraging since at the time of "maximal medical improvement", when he had his left hip replacement surgery on October 17, 2011, he was and is still unable to obtain, much less maintain, full time employment. In the case of *Whitfield, supra,* the plaintiff, who suffered a shattered femur and leg injuries and could still work, was found to have presented enough evidence to sustain an award of $3,000,000.00 on *remittitur*. In the present case it is fair to establish that Mr. West's damages are unquestionably more extensive that Whitfield's, a young Navy man who despite a hip injury, could walk normally and even passed a Navy's physical readiness test by running 2.5 miles according to the evidence.

Therefore, considering the uncontested evidence presented at the hearing by the Plaintiff, the Court finds for Plaintiff in

the amount of $4,000,000.00, which is the highest amount for which there is adequate evidentiary support. The total amounts for damages are as follows:

1. Past and Future hip replacement surgeries and medical costs, $1,000,000.00;
2. Economic losses due to past unemployment and present and future underemployment due to the permanent damages, $500,000.00;
3. Past and future actual pain and suffering on account of his permanent injuries, $1,500,000.00;
4. Emotional damages, $1,000,000.00,

for a total of **$4,000.000.00.**


IT IS SO ORDERED.

In San Juan, Puerto Rico, on August 26, 2013.

S/ Juan M. Pérez-Giménez  
Juan M. Pérez-Giménez  
Senior U.S. District Judge